## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br><br>v.<br><br><br>STATE OF RHODE ISLAND<br><br>Defendant. | Civil Action No. 24-cv-00531 |

### CONSENT DECREE

### I.     INTRODUCTION

1.      In December 2021, the Office for Civil Rights at the Department of Health and Human Services ("HHS") initiated an investigation under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, to determine whether children with behavioral health disabilities in the care and custody of Rhode Island's child welfare agency ("DCYF") are unnecessarily segregated in an acute-care psychiatric hospital. In July 2022, after receiving similar complaints, the U.S. Attorney's Office for the District of Rhode Island notified DCYF of its intent to conduct a joint investigation with HHS pursuant to Title II of the ADA.

2.      On May 13, 2024, the HHS and the U.S. Attorney's Office issued a letter notifying DCYF and the State of Rhode Island of its findings that Rhode Island is violating Title II of the ADA, as interpreted in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), and Section 504. The State acknowledges HHS and the U.S. Attorney's Office's findings and, while the State disputes aspects of those findings,

the State remains committed to achieving the shared goal of fostering and strengthening community-based services for those children with behavioral health disabilities in the care and custody of DCYF, so they are treated in the most integrated setting appropriate to their needs to support child safety, psychosocial development, permanency and wellbeing, and overall family functioning. This Consent Decree resolves allegations in the United States' complaint based on its May 13, 2024 findings. The Parties to this Consent Decree are the United States and the State of Rhode Island.

3.      This Consent Decree is intended to remedy the State's alleged noncompliance with the ADA and Section 504 through design and implementation of an agreed-upon remedial plan, the core elements of which are detailed below and in the Consultant Scope of Work.

4.      The purpose of this Consent Decree is to transition children who have been hospitalized at Bradley Hospital to family settings with needed community-based services, and to prevent children with behavioral health disabilities from experiencing avoidable or unnecessarily prolonged psychiatric hospitalization.

5.      The Effective Date will be the date the Court approves this Consent Decree.

## II.    DEFINITIONS

6.      "Behavioral Health Disability" is a serious emotional disturbance, mental illness, and/or behavioral disorder that results in functional impairment, which substantially interferes with or limits the child's role or functioning in family, school, or community activities, as determined by a Clinical Assessment Tool.

7.      "Bradley Hospital" is Emma Pendleton Bradley Hospital, a private, acute psychiatric hospital located in East Providence, Rhode Island.

8.      "Child" or "children" is a resident of Rhode Island under the age of 21 who has an "Open Case" to DCYF.

9.      "Clinical Assessment Tool" is a standardized, validated, and evidence-based mental health assessment tool of a child's functioning and identified needs and strengths across crucial life domains, administered by a clinician, including those performed by Bradley Hospital. The Clinical Assessment Tool will inform decisions about level of care, and the type and intensity of services. DCYF, the United States, and the Monitor will agree on the Clinical Assessment Tool DCYF will use as part of this Consent Decree.

10.     "Community-Based Services" are behavioral health services provided in a child's family home and in the community. Community-Based Services include, but are not limited to, Intensive In-Home Services (including In-Home Mental Health Services, In-Home Family Stabilization and Prevention, Parent Skill Building, Youth Support, In-Home Developmental Disability Services, Foster and Kinship Home Support), Substance Use Disorder Treatment, Crisis Response and Stabilization, Respite, Family Peer Support, and Psychiatric Services and Medication Management. Community-Based Services may be provided as components of services covered by Rhode Island's Medicaid program (e.g., State plan and Section 1115 demonstration).

11.     "Family" or "families" means biological parents, adoptive parents, foster parents, kinship caregivers (including both relatives and fictive kin), or other guardians or custodians where applicable.

12.     "Focus Population" means any child who has an "Open Case" to DCYF and meets one of the following criteria:

a. The child is currently admitted to Bradley Hospital for acute inpatient treatment;

b. The child was admitted to Bradley Hospital for acute inpatient treatment within one year before the Effective Date of this Consent Decree;

3

c. The child is admitted to Bradley Hospital for acute inpatient treatment at any point during this Consent Decree; or

d. The child is deemed at serious risk of admission to Bradley Hospital for acute inpatient treatment because the child has had three or more emergency room visits within a twelve-month period (following the Effective Date of this Consent Decree) as a result of a current or subsequent diagnosed Behavioral Health Disability. If the child does not have a current clinical assessment, DCYF will conduct one using a Clinical Assessment Tool.

13. The "Intensity" of a Community-Based Service is the frequency of contact, breadth and depth of service based on acuity, and length of time the child is receiving the service recommended in the child's Individualized Service Plan (ISP) or Ongoing Family Functional Assessment and Service (OFFA).

14. "Open Case" refers to a child who is either: (a) assigned a DCYF Family Service Unit caseworker (in-home or out-of- home) or (b) determined eligible for treatment through the voluntary DCYF's Children's Behavioral Health Family Navigation Unit (FNU). The Parties agree that, as part of the State's development of the Implementation Plan, DCYF's existing process for determining FNU eligibility is subject to review and potential revision.

15. "Quality Service Reviews (QSRs)" are in-depth, consistently performed, assessments of services provided to specific children and the outcomes of those services, that are used to assess at both the individual and the systemic level whether children's and families' needs are being identified and met and their goals are being achieved through services that build on children's and families' strengths and preferences. QSRs may include information generated by DCYF monthly Child and Family Service Reviews (CFSRs) consistent with HHS Children's Bureau

4

methodologies. QSRs assess whether services are being provided in the most integrated setting appropriate to each child's needs.

16. "State" is the State of Rhode Island, including, but not limited to, the Department of Children, Youth & Families (DCYF).

17. "Therapeutic Foster Care" is provided by an adult individual or couple who receive training and support from a DCYF-contracted agency and are licensed by DCYF to provide substitute parental care to children with a Behavioral Health Disability in a family setting.

### III.  BASELINE DATA REPORT

18. Within 180 days of the Effective Date of this Consent Decree, the State will provide a Baseline Data Report to the United States and the Monitor. The Baseline Data Report will include all data elements that the State is able to report from the general categories of data described in Paragraph 19 and any other elements developed in coordination with the Monitor and agreed on by the Parties.

19. At a minimum, the Baseline Data Report will include data, presented statewide on the following general areas:

a. Overview of the Focus Population with Bradley Hospital admissions (paragraph 12(a)-(b)), including the number of children in the Focus Population, where they are located (both geographically and by type of service setting, e.g., hospitals, Residential Treatment Facilities, community), their demographic characteristics, and whether they are child welfare-involved or open through the voluntary Children's Behavioral Health pathway;

b. Availability of Community-Based Services and Therapeutic Foster Care parents statewide, including the number and type of Community-Based Service providers and Therapeutic Foster Care parents and their capacity, broken down by service type; and

c.  The number of children with Open Cases who experienced three or more emergency room visits within a twelve-month period (including the 6-month period preceding the Effective Date of this Consent Decree) as a result of a current or subsequent diagnosed Behavioral Health Disability, including the number and length of stay of each child's visits. The Parties acknowledge that systems to automatically track this data are not currently in place but will be developed as part of the Implementation Plan.  In the interim, DCYF will track this data through internal reports.

20.    The State will post the Baseline Data Report to DCYF's website within 14 days of producing the report.

## IV.    IMPLEMENTATION PLAN

21.    To bring the State into compliance with all requirements of this Consent Decree, the State will conduct a review of Rhode Island's children's behavioral health service system. The review will assess the following:

a.  DCYF's processes to identify children in the Focus Population;

b.  DCYF's discharge and transition planning once a child in the Focus Population is admitted to Bradley Hospital;

c.  DCYF's service and care coordination for children in the Focus Population;

d.  The capacity and sufficiency of Community-Based Services available to children in the Focus Population;

e.  The capacity and sufficiency of mobile crisis response and crisis prevention, intervention, and stabilization services available to children in the Focus Population;

f.  The capacity and sufficiency of Therapeutic Foster Care for children in the Focus Population; and

g. All relevant policies, standard operating procedures, and mechanisms for data collection and coordination across agencies, existing Medicaid-funded HCBS waivers, state plan policies and reimbursement structures and payment methodologies to determine what, if any, changes may be needed to assure the State's compliance with this Consent Decree.

22. This review will be conducted by one or more independent, qualified third-party consultant(s) selected by the State and subject to non-objection by the United States.

23. Within six months from completion of the Baseline Data Report, the third-party consultant will provide a report of his or her preliminary observations and recommendations based on the review of the areas identified in paragraph 21 for implementation to both Parties and to the Monitor. In preparing this report, the consultant shall confer and consult with relevant stakeholders, including those identified in Section IX below, in formulating his or her preliminary observations and recommendations.

24. Within 90 days from submission of the consultant's report, the State will submit a proposed Implementation Plan to the United States and to the Monitor that details, in light of the recommendations made in the consultant's review and report, the actions the State proposes to take to fulfill the obligations of this Consent Decree. During this 90-day period, the State shall facilitate consultations with relevant stakeholders, including those identified in Section IX below, on its proposed Implementation Plan.

25. At a minimum, the proposed Implementation Plan will include:

a. Timelines for implementation of specific obligations within this Implementation Plan, including interim deadlines;

    b.  Assignment of agency, department, unit, or other entity responsible for the specific obligations within the Implementation Plan;

    c.  Action steps to accomplish these specific obligations; and

    d.  Identification of funding mechanisms for specific obligations within the Implementation Plan.

26.    The Monitor will provide comments regarding the proposed Implementation Plan within 14 days of receipt. The United States may also provide comments regarding the proposed Implementation Plan within 14 days of receipt. The State will timely revise its proposed Implementation Plan to address comments from third-party stakeholders, the United States and the Monitor; the Parties and the Monitor will meet and consult as necessary. Before finalizing the proposed Implementation Plan, the State will facilitate any additional stakeholder consultations on revisions to the proposed Implementation Plan, as needed.  The final version of the Implementation Plan as agreed to by the Parties and Monitor will be filed with the Court within 14 days after the Implementation Plan is finalized.

27.    If the Parties cannot reach agreement on an Implementation Plan, the United States may withdraw its consent to the Consent Decree, and both Parties may revive any claims or defenses otherwise barred by its operation.

28.    If the Parties reach agreement on an Implementation Plan, the Implementation Plan, and all amendments or updates thereto, as agreed to by the Parties and the Monitor, will be incorporated into and become enforceable as part of this Consent Decree.

29.    After the Implementation Plan is finalized, the Parties and the Monitor will meet and consult to discuss the plan and determine a regular schedule of ongoing meetings. During these meetings, the Parties and the Monitor will review progress on achieving compliance, goals and objectives, implementation challenges, and steps

being taken to address implementation challenges. The Monitor may provide recommendations to the State regarding strategies on achieving compliance.

30.    Except as otherwise agreed to under a specific provision of this Consent Decree, the State will have achieved compliance with the Consent Decree and Implementation Plan for:

> a.  Section V (Identification and Assessment), Section VI (Discharge and Transition), Section VII (Service Planning and Care Coordination), Section IX (Stakeholder Outreach and Public Participation), Section X (Community Provider Development), and Section XI (Quality Assurance and Performance Improvement) within three years of the Effective Date; and
>
> b.  Section VIII (Community-Based Services) within four years of the Effective Date.

## V.    IDENTIFICATION AND ASSESSMENT

31.    The State will establish and implement policies or procedures for effectively identifying children within the Focus Population, including but not limited to the creation of data-sharing agreements between DCYF, the Department of Behavioral Healthcare, Developmental Disabilities & Hospitals (BHDDH), the Department of Health, and the Executive Office of Health and Human Services.

32.    The State will establish and implement policies and procedures to ensure that a timely, person-centered behavioral health assessment, using a recognized Clinical Assessment Tool, is conducted for all members of the Focus Population, as clinically indicated. The purpose of the assessment is to gather comprehensive and individualized information about the child and identify the goals, strengths, needs, preferences, and cultural factors of the child and family.

33.    The State will establish and implement policies or procedures to track all instances when a child has: (a) been admitted for inpatient psychiatric care at

Bradley Hospital; or b) been evaluated for a potential in-patient hospitalization by a hospital emergency department as the result of a psychiatric crisis. Whenever the State learns that either of those events has occurred, it will request all available information from Bradley Hospital or the hospital emergency department regarding any psychiatric assessment or evaluation of the child that was performed by Bradley or the emergency department.

34.    The State will establish and implement policies or procedures to ensure prompt delivery of services necessary to address any behavioral health crisis or other urgent need for stabilization or intervention identified in the assessment process.

35.    Children in the Focus Population who are assessed and found to not need the services in this Consent Decree will be referred and linked to other behavioral health, social, and/or community services as needed.

## VI.    DISCHARGE AND TRANSITION FROM HOSPITAL TO COMMUNITY

36.    When a child in the Focus Population has been admitted to Bradley Hospital,  the State will establish and implement policies or procedures to ensure that the child is discharged to the most integrated setting appropriate to their needs, with needed Community-Based Services and supports, when the child is deemed ready for discharge by Bradley Hospital, through coordination with Bradley Hospital, the Child and Family Team (see Section VII), and the Transition Coordinator (see Paragraphs 37-45).

37.    Transition Coordinators will be assigned to every child in the Focus Population admitted to Bradley Hospital, within five days of the child's admission to Bradley Hospital. The State's consultant's report, pursuant to Paragraphs 23-24, will provide recommendations for the use of Transition Coordinators with experience in facilitating access to community-based behavioral health services and who are

familiar with the available Community-Based Services. Transition Coordinators will not be employed by any psychiatric hospital.

38.     The role of the Transition Coordinator will be further defined in the Implementation Plan but will include processes for collaborating with the Child and Family Team and Bradley Hospital to timely develop a written Transition Plan that includes the child's specific needs and goals, along with the general categories of services and supports that are needed for the child to be discharged and served appropriately in the most integrated setting appropriate to the child's needs. Each child's Transition Plan should identify the services and supports necessary to meet the child's behavioral health needs in the most integrated setting appropriate to the child's needs, anticipated barriers to discharge, and how those barriers may be resolved. The Transition Plan should include steps to maintain or develop connections between the child and the community to which the child is expected to return, even while the child is at Bradley Hospital, such as virtual meetings with family, friends, providers, opportunities for cultural connection with communities of origin, Community-Based Service providers, and schools. DCYF will provide for the timely implementation of the Transition Plan, which will be incorporated into the Individualized Service Plan (ISP) or Ongoing Family Functional Assessment and Service (OFFA).

39.     The Transition Coordinator, working with the Child and Family Team, will proactively and on a regular basis, monitor the child's stay and engage with Bradley Hospital to review the Transition Plan and identify progress towards the child's goals and any barriers to discharge.

40.     The Transition Coordinator will involve providers of Community-Based Services and DCYF as needed to address barriers that the child faces in accessing Community-Based Services, taking steps such as arranging visits and meetings between providers and the child and family. The Transition Coordinator will elevate

any barriers they are unable to resolve to the DCYF focal point identified in the Implementation Plan, see Paragraph 25(b).

41.    As part of the Implementation Plan, the State will identify potential funding mechanisms to provide Community-Based Service providers (as described in Section VIII) with reimbursement for participating in service planning activities for children in the Focus Population preparing to transition out of Bradley Hospital, even before the children are authorized to receive Community-Based Services.

42.    For any child in the Focus Population who remains at Bradley Hospital because Community-Based Services that could support the child to live in the most integrated setting appropriate to the child's needs are not available, the Transition Coordinator, in consultation with the Primary Case Worker and, where necessary, the Child and Family Team will identify barriers to discharge and concrete actions to resolve those barriers. The Transition Coordinator will include the notes from those weekly meetings in the child's records.

43.    The Parties acknowledge and agree that there may be circumstances where a child in the Focus Population is deemed medically ready for discharge from Bradley Hospital, but a court decision or order requires the State to delay or reconsider the child's planned discharge. The Parties agree that in these limited circumstances, and subject to review by the Monitor, it is not a violation of this Consent Decree if the child remains at Bradley as a result of a court order or decision, as long as the child and family continue to receive Service Planning, Care Coordination and Transition Coordination. The Transition Coordinator will document any state court order or decision delaying or rejecting any discharge plan in the child's records.

44.    Any child that is discharged from Bradley Hospital to a setting that is not in a family home or community setting will continue to receive care coordination and transition coordination services to transition the child to a family home or

community setting with Community-Based Services. The case will also be referred to the Monitor who will review and report on whether the child was discharged to the most integrated setting appropriate.

45.    Transition Coordinators will report monthly to the State on the services needed by children that pose barriers or delay transition and provide an estimate of the need for each service for incorporation in the State's Quarterly Data Report (see Paragraph 87).

## VII.    SERVICE PLANNING AND CARE COORDINATION

46.    The State will establish and implement policies or procedures to ensure the prompt convening of a Child and Family Team to manage care for each member of the Focus Population who has been identified to need ongoing services in this Consent Decree to address a Behavioral Health Disability.

47.    The Child and Family Team members will include the child and family (and/or other adult(s) committed to the well-being of the child), the Primary Service Worker (as described in this Section), any other care coordinators working with the child, relevant service providers, educators, and, where desired by the child or family, family and Youth Peer Support specialists, legal advocates, extended family members, friends, or other natural supports. The Child and Family Team will also include relevant DCYF staff, such as case workers and probation officers. The child and family will be full members of the Child and Family Team and be partners in service planning and coordination, including in the identification of individual and family strengths and resources that could help the child live in the most integrated setting appropriate to the child's needs.

48.    The Child and Family Team will promptly develop an Individualized Service Plan (ISP) or update the child's Ongoing Family Functional Assessment and Service (OFFA) plan for the child that is informed by the Clinical Assessment Tool. For children with Individualized Education Plans (IEPs), when developing the ISP or

OFFA, the Child and Family Team will consider the IEP, and seek to coordinate with the child's IEP team, to the extent possible. Services related to intellectual or developmental disabilities will be included in the ISP or OFFA and coordinated by the Care Coordinator.

49.    The ISP or OFFA will include the child's developmental needs, goals for the child that are derived from those needs, and the plan for addressing those needs and achieving those goals. The ISP or OFFA will: (a) describe and incorporate the strengths, needs, and goals of the child and family; (b) be culturally competent and demonstrate respect for and build on the values, preferences, beliefs, culture, and identify of the child and family, and their community; (c) identify strategies, supports, and services that the family and providers will use to anticipate, prevent, and effectively respond to crises; (d) identify the specific formal and natural supports and services necessary to meet the identified needs of the child in the most integrated setting appropriate and the intensity with which each will be provided; (e) identify the providers of Community-Based Services and other sources for formal and natural supports and services who will meet the needs described in the ISP; (f) describe how services among different provider agencies will be aligned to achieve the desired outcomes; and (g) plan for transportation to and from services, whenever necessary.

50.    The Primary Service Worker will, during the ISP or OFFA process, work to connect children with an immediate need for Community-Based Services to those services in a timely and prompt manner. The Primary Service Worker will consult with and receive assistance from the focal point designated by the Implementation Plan whenever needed services appear unavailable, such as when the Primary Service Worker is unable to identify providers of a particular type of service in a particular geographic area, and will convene the Child and Family Team to develop contingency plans so that children in the Focus Population have access to specific back-up Community-Based Service providers.

51.    The State will ensure that services that are identified in a child's ISP or OFFA are promptly initiated upon completion of the plan, and the Primary Service Worker will inform the child and family of the State's efforts taken to secure services. Notification of the efforts to secure services identified in an ISP or OFFA does not lessen the State's obligation to provide the services as required by this Consent Decree.

52.    The State will ensure access to care coordination to members of the Focus Population. Care coordination includes proactive and assertive engagement of the child and family to take an active role in treatment and treatment planning and will be provided by a Primary Service Worker who has the overall capacity to successfully identify and facilitate access to the applicable Community-Based Services.

53.    The Primary Service Worker will convene the Child and Family Team regularly and as frequently as necessary to meet the child's and family's needs and to review and update, after any significant change of needs or circumstances, implementation of the ISP or OFFA. Child and Family Team meetings will be scheduled at a time and location convenient to the family. No decisions about the child's ISP or OFFA will be made by members of the Team without the participation of the child and family.

54.    The State will include in its annual budget submissions a request for a statewide flexible fund ("flex fund") to address barriers to returning members of the Focus Population to the most integrated setting appropriate to their needs that cannot otherwise be addressed through Community-Based Services, as determined through the ISP or OFFA processes. Primary Service Workers will help Focus Population members access flex funds. Subject to legislative approval, any flex funds that are not used in a given year may be rolled over for use the following year.

55.    Children and families may decline the convening of a Child and Family Team and/or care coordination services. The Primary Service Worker will make reasonable efforts to engage the child and family regarding their reluctance to receive care coordination, such as making personal outreach to the child/family to find out the reasons for their reluctance to participate in a Child and Family Team. The Primary Service Worder will document the reasons why families decline care coordination. If a family declines Care Coordination, no ISP will be developed. However, for children open to the Family Service Unit, the Primary Service Worker will develop an OFFA and arrange access to the Community-Based Services identified as appropriate for the child.

56.    The State will establish and implement policies or procedures for State agencies that have a role in the provision of behavioral health services to children to enter into formal agreements that outline the expectations for participation of their staff as needed in Child and Family Team meetings and allow the Primary Service Worker to receive information from providers and systems serving children in the Focus Population.

## VIII.   COMMUNITY-BASED SERVICES

### A.    General Requirements

57.    The State will establish and implement policies or procedures that ensure that children in the Focus Population and their families receive, in a timely manner, access to the Community-Based Services described in this Consent Decree that they need. Community-Based Services will be child- and family-centered, trauma-informed, individualized to the child's and the family's strengths and needs, of sufficient quality, and available and accessible statewide to all children in the Focus Population in the necessary intensity and location. Community-Based Services also will be available during times of the day that meet the needs of the Focus Population and their families, such as after school and on weekends, as necessary.

58.     The goals of Community-Based Services will be to help members of the Focus Population and their families build the skills necessary to allow the child to live in a child's family home or community.

59.     The State will establish and implement policies or procedures that effectively provide members of the Focus Population and their families access to transportation to and from those services that are not provided in the family home (or foster home, where applicable).

60.     The State will establish and implement policies or procedures that effectively provide children in the Focus Population with Intellectual Developmental Disabilities (IDD) with Community-Based Services from providers who have personnel qualified and specifically trained in working with children with IDD.

61.     The State will establish and implement policies or procedures that effectively provide families and, where appropriate, children, with accurate, timely, and accessible information regarding the available Community-Based Services.

**B.     Intensive In-Home Services**

62.     The State will establish and implement policies or procedures that effectively identify and provide access to Intensive In-Home Services for members of the Focus Population, provided in the child's location and/or in the community, and available during times of the day that meet the needs of the child and family, such as after school and on weekends, as necessary. The Intensive In-Home Services will be available in sufficient intensity to meet the needs of the child as identified in their ISP or OFFA.

63.      Intensive In-Home Services include, but are not limited to:

a. In-Home Individual Therapy: A structured, consistent, strengths-based therapeutic relationship between a licensed clinician and the child for the purpose of effectively addressing the child's behavioral health needs and developing needed skills.

b. In-Home Family Therapy: A structured, consistent, strengths-based therapeutic relationship between a licensed clinician, the child, and family for the purpose of effectively addressing the child's behavioral health needs, developing needed skills, and improving the family's ability to provide effective support for the child to promote the child's healthy functioning within the family, school, and community.

c. Behavioral Services: Services that address behaviors that interfere with successful functioning in the home and community, including: a functional behavioral assessment; development and implementation of a positive behavioral support plan; modeling for the family and other caregivers how to implement the behavior support plan; and aides who assist with implementing the positive behavioral support plan, monitoring its effectiveness, and reporting back to the Child and Family Team.

d. Therapeutic Mentoring: Structured, one-to-one, strengths-based support to a child in the home or community for the purpose of teaching skills addressing daily living, social, and communication needs in the child's natural environment.

### C.   Therapeutic Foster Care

64.    The State will establish and implement policies or procedures that ensure that all children in the Focus Population who need Therapeutic Foster Care are provided with placement in a Therapeutic Foster Care Home.

65.    The State will develop, implement, review and update as needed a recruitment plan to address any current or future shortages of Therapeutic Foster Care homes. The plan will include tracking and reporting issues regarding access to Therapeutic Foster Care homes. The Implementation Plan will identify immediate steps the State will take to review and address any current or anticipated shortages.

66.     The State will establish and implement policies or procedures to ensure that Therapeutic Foster Care families receive services and clinical supports to maintain the community placement of a child in the Focus Population.

67.     DCYF will provide Therapeutic Foster Care families reimbursement for their participation in service planning activities for children in the Focus Population to assist the child's transition out of Bradley Hospital.

### D.     Mobile Crisis Response and Crisis Prevention, Intervention & Stabilization Services

68.     The State shall continue to provide a crisis hotline, such as currently provided through 988, that is available throughout the state and staffed 24 hours per day, seven days per week. The State shall ensure that the crisis hotline has the capacity to answer calls at all times.  Answering machines and voicemail will not be used for the crisis hotline, and callers will be directly connected to a mental health professional trained to provide telephonic crisis response. Hotline staff will:

a.  assess the crisis including whether it is appropriate to resolve the crisis through a phone intervention or dispatch a Mobile Crisis Response team, such as currently provided by the Certified Community Behavioral Health Clinics. The State shall use criteria agreed upon by the Parties to guide decisions by hotline staff;

b.  assist with immediate stabilization efforts;

c.  where it is determined that it is appropriate to resolve the crisis through a phone intervention, help the caller identify and connect with needed local services, including by providing referrals to local providers; and

d.  facilitate a face-to-face Mobile Crisis Response team to be dispatched when and where needed per the specified criteria.

69.     Mobile Crisis Response teams will consist of a Master's level mental health professional and a paraprofessional (who may be a Parent or Youth Peer Support Specialist).

70.     Mobile Crisis Response shall be available for all children experiencing a behavioral health crisis under the age of 21.

71.     The State shall ensure that, when dispatched, Mobile Crisis Response teams respond in person within 60 minutes at the location in the community where a crisis arises, or a location or time requested by the family and agreed upon by the family and team.

72.     Mobile Crisis Response teams will attempt to resolve the crisis by, among other things, reducing or eliminating immediate stressors and de-escalating behaviors and interactions. Mobile Crisis Response teams shall consider the precipitant of the crisis and the strengths of the child and family that can be used to address the crisis.

73.     Mobile Crisis Response teams will have access to needed information regarding the child and family when the family provides consent (including any existing crisis plans and the ISP or OFFA) and will work with children, their families, and their Child and Family Teams to identify strategies and necessary services that will enable the family to manage a crisis, move beyond the crisis, and avoid future crises. These will be incorporated into the child's ISP or OFFA.

74.     Where the child does not have a Child and Family Team, the Mobile Crisis Response team shall provide referrals to immediately needed services and if the child is identified as belonging to the Focus Population, the State will assemble a Child and Family Team, including a Primary Service Worker to draft an initial safety plan that can be incorporated into an ISP or OFFA.

75.     The State will ensure that Mobile Crisis Response teams work proactively with local law enforcement officials to inform them of their services and

establish any needed policies and protocols to coordinate their work. The Mobile Crisis Response team will attempt to resolve crises without involvement of law enforcement, wherever possible. If the Mobile Crisis Response team requests law enforcement involvement, it shall stay on the scene and provide assistance to law enforcement as appropriate and to the extent possible.

76.    The State shall ensure access to needed in-home crisis stabilization services after a crisis occurs for as long as necessary to stabilize the situation.

77.    The State will implement additional behavioral health crisis intervention and stabilization services to decrease psychiatric hospitalizations during behavioral crises.

## IX.    STAKEHOLDER OUTREACH AND PUBLIC PARTICIPATION

78.    The State and the United States will meet with the Child Advocate's Office and RI Coalition for Children & Families to provide information about the goals and requirements of the Consent Decree and seek input into development of the Implementation Plan. The State will consider input from these stakeholders in developing the proposed and final versions of the Implementation Plan (see Section IV).

79.    The State will convene an advisory group, including a representative cross-section of Community-Based Services providers (both current and prospective), children and parents or caregivers of children in the Focus Population, and advocates for children in the Focus Population, along with representatives from limited English populations. On an ongoing basis, the State will submit proposed policy, regulatory, and procedure changes relevant to this Consent Decree and the Implementation Plan to the advisory group for comment and implement responsive changes where appropriate. The State will also work with this advisory group in developing the Implementation Plan.

80.     On an ongoing basis, the State will conduct outreach to stakeholders (including children and their families, schools, hospitals, Residential Treatment Facilities, judges, child welfare staff, juvenile justice staff, and providers of Community-Based Services) to seek feedback regarding the Community-Based Services provided under the Consent Decree and Implementation Plan. If the Court approves and the Parties and Monitor agree, the Implementation Plan may be adjusted or modified to reflect any stakeholder feedback necessary to achieve the objectives of this Consent Decree.

## X.    COMMUNITY PROVIDER DEVELOPMENT

81.     The State will establish and implement policies or procedures to address any current or future workforce shortages of Community-Based Services providers and Therapeutic Foster Care homes (collectively, "Community Providers"). Workforce shortages may refer to the overall number of Community Providers, by specialty, and Community Providers' skill level and quality. The Implementation Plan will include a workforce development plan to develop a network of Community Providers at a number and quality sufficient to enable children in the Focus Population to have access to needed Community-Based Services to remain in, or successfully transition back to, family homes or communities. The consultant will consider, and the workforce development plan may include:

> a.  Financial and non-monetary incentives to Community Providers to expand their capacity and performance in meeting specific milestones;
>
> b.  Initiatives designed to recruit out-of-state Community Providers;
>
> c.  A proposal to establish partnership opportunities with the State's workforce investment and higher education systems to focus resources toward developing a career pathway and improving recruitment and retention strategies to address workforce shortages within the Community Provider sector; and

22

   d.  Recommendations for the State to maintain a qualified pool of Community Providers across Rhode Island.

82.    The State will establish and implement a workforce development plan to enhance provider capacity throughout the state, so that children in the Focus Population who need Community-Based Services can access those services in a reasonably timely manner.

83.    The State will develop information and training materials relating to the terms of this Consent Decree and Implementation Plan, including descriptions of available Community-Based Services, to be delivered and available for viewing at any time by Families, child welfare and juvenile justice workers, behavioral health service providers, judges, prosecutors, public defenders, law enforcement, and schools. Additional training will be provided to Care Coordinators, Transition Coordinators, and Mobile Crisis Response teams serving or seeking to serve children in the Focus Population to ensure that they are aware of the obligations in this Consent Decree and Implementation Plan.

84.    The State will require as a condition of contracting or certification that any approved provider of Community-Based Services, including Therapeutic Foster Care home providers and Intensive In-Home Service providers, ensure targeted training of assigned personnel to address the particular needs of the Focus Population and effectively provide the services required by the Consent Decree and Implementation Plan.

85.    The State will submit the training materials for the trainings in Paragraphs 83 and 84 to the Monitor and the United States for comment. The Monitor and the United States will have 14 days to offer comments on the materials and qualifications of the trainers.

XI.    **QUALITY ASSURANCE AND PERFORMANCE IMPROVEMENT**

A.    **Collection and Analysis**

86.    The Implementation Plan will provide for the production of Quarterly Data Reports by the State. These Reports will measure the degree to which children are being diverted from and transitioned out of Bradley Hospital. The Parties acknowledge that systems for data collection will need to be developed and included as part of the Implementation Plan.

87.    The Quarterly Data Reports will, as data collection systems become operational, include updated data on the same general areas documented in the Baseline Data Report. The Quarterly Data Reports will also include, as data collection systems become operational and the provisions of the Implementation Plan with respect to Community-Based Services are put into place, aggregated data on the provision of Community-Based Services for children in the Focus Population, including the intensity and timeliness of services provided, and gaps in Community-Based Services for children in the Focus Population, including the extent to which Community-Based Services identified in a child's ISP or OFFA were not available, either in a timely manner or at all, broken down by type of service.

88.    The Implementation Plan will include processes to track all services described in Section VIII of this Consent Decree that are identified in an ISP or OFFA but not initiated within 45 days of the ISP's or OFFA's completion, including services determined to be unavailable as described in Paragraph 50. Once available, the State will incorporate the data it collects pursuant to this paragraph in its Quarterly Data Report (see Paragraph 87).

89.    The State will convene a Quality Assurance Committee composed of personnel from the State entities responsible for implementing the Consent Decree. The Quality Assurance Committee will meet no less than quarterly to review data,

and identify any needed responsive actions at the provider, regional, and system-wide levels to improve outcomes for children in the Focus Population.

90.    The State will post the Quarterly Data Reports to DCYF's website within 14 days of producing the reports.

91.    The State will report to the United States and the Monitor any systemic or institutional changes adversely affecting the State's ability to provide the Focus Population with the Community-Based Services required by this Consent Decree. The Quality Assurance Committee will consider these reports in identifying responsive actions to improve outcomes for children in the Focus Population.

**B.    Quality Service Review Process**

92.    At least annually, the Monitor will conduct Quality Service Reviews ("QSRs") of a random sample of children in the Focus Population receiving Transition Coordination, Care Coordination, and Community-Based Services. The Monitor's random sample will include a sufficient number of children who are currently hospitalized or have recently been hospitalized at Bradley Hospital to enable the Monitor to draw systemic conclusions about the service system's performance in transitioning children out of the hospital and meeting children's needs in the community. The sample will also include children in the Focus Population who are not receiving services described in Sections VI, VII, and VIII to enable the Monitor to draw reliable conclusions about whether the identification and assessment process is successfully identifying the children who require the services included in this Consent Decree and connecting them to those services.

93.    The QSR process will evaluate, among other things, whether all of the child's goals and needs are being identified, and whether services provided are sufficient to enable the child to live in the most integrated setting appropriate to meet their needs. For Focus Population members in Bradley Hospital, the process will

evaluate any barriers to discharge and whether those barriers were or were not elevated to identified focal point.

94.     The QSRs will collect information from the following sources, as appropriate and available: interviews of Focus Population members, their families, their Primary Service Worker, and, where there is active engagement with the child or family, Community-Based Service providers, school staff members, and hospital staff, and analysis of ISPs or OFFAs, safety plans, Transition Plans (as described in Section VI of this Consent Decree), and treatment records.

95.     If during the course of the QSR process a child is identified as subject to an immediate safety risk, the individual conducting the QSR will inform the State of the immediate risk and the State will take appropriate action to ensure the child's safety.

96.     When the Monitor and the State determine it is appropriate, the Monitor will transition to DCYF officials who will be responsible for the QSRs. If requested by the Monitor, these State officials will shadow the Monitor while the Monitor conducts the QSRs. The Monitor will review and validate the QSR data and analysis conducted by DCYF representatives.

97.     Each year, the results of the QSR will be summarized in a QSR report. Until DCYF representatives conduct the QSR in accordance with Paragraphs 92-94, the Monitor will draft the QSR report. When DCYF representatives take responsibility for conducting the QSR, DCYF representatives will complete the report using the same format as the Monitor's previous reports. The State's QSR reports will also include a summary written by the Monitor of his or her review of the State's QSR, including a report of the review and validation determination made. The State will publish the QSR reports on DCYF's website within 14 days after the report and Monitor's summary, if applicable, is completed.

### XII.   MONITOR

98.    The Parties agree that a Monitor will be appointed for a period of five years from the Effective Date or until this Consent Decree is terminated. Within 45 days of the Effective Date, or additional time if agreed to by the Parties, the Parties will select a Monitor. If the Parties are unable to agree on a Monitor selection within the timeframe agreed to by the Parties, each Party will submit a proposed Monitor to the Court, and the Court will select the Monitor from the Parties' proposals. Once appointed, the Monitor will be an agent of the Court.

99.    Throughout the term of this Consent Decree, the Monitor will gather, analyze, and report on data reflecting the State's progress in implementing and complying with the requirements of this Consent Decree and the Implementation Plan. The Monitor will pursue a problem-solving approach to amicably resolve any disagreements that arise between the Parties so the Parties can focus on the State's compliance with the Consent Decree.

100.    The State will pay the Monitor a maximum of $250,000 per year for performing all of the Monitor's duties under this Consent Decree. The Parties recognize the importance of ensuring that the fees and costs of monitoring the Consent Decree are reasonable. The Monitor will submit a proposed budget annually to the Parties for comment, and to the Court for approval. The Monitor will submit itemized monthly invoices to the State, and the State will pay the Monitor's invoices promptly. All such invoices will comply with the State's procurement and reimbursement rules and regulations. If the State disputes the invoice, the State may raise the concern by motion and the Court will rule on the appropriateness of the charge. The Court retains the authority to resolve any dispute that may arise regarding the reasonableness of fees and costs charged by the Monitor.

101.    The Monitor will only have the duties, responsibilities, and authority conferred by this Consent Decree. The Monitor will be subject to the supervision and orders of the Court.

102.    Neither the State, the United States, nor any of their staff or agents will have any supervisory authority over the Monitor's activities, reports, findings, or recommendations.

103.    Only the Court and the Monitor will have authority to review or disclose internal monitoring records. Internal monitoring records include any documentation of internal deliberations among the Monitor and its consultants, and any drafts of reports or other work product produced in the course of the Monitor's duties.

104.    The Monitor may contract or consult with other persons or entities to assist in the evaluation of compliance. The Monitor will pay for these services out of his or her budget. The Monitor is ultimately responsible for any compliance assessments made under this Consent Decree.

105.    The Monitor will be permitted to engage in *ex parte* communications with the State, the United States, and the Court regarding this Consent Decree.

106.    Other than to carry out the express functions set forth in this Consent Decree, the Monitor will hold in strict confidence all information learned through monitoring activities.  Either Party may file a motion with the Court to remove and terminate the Monitor for breach of this duty of confidentiality.

107.    In the event the Monitor is no longer able to perform his or her functions or is removed, within 60 days thereof, the Parties will together select and advise the Court of the selection of a replacement Monitor, acceptable to both. If the Parties are unable to agree on a Monitor, each Party will submit a proposed Monitor to the Court, and the Court will select and appoint the Monitor from the Parties' proposals.

108.    The Monitor shall not serve as a Monitor in another agreement with the United States while serving as the Monitor for this Consent Decree.

109.    The Monitor and the United States will have full access to persons, staff, facilities, buildings, programs, services, documents, data, records, materials, and things that are necessary to assess the State's progress and implementation efforts with this Consent Decree. Other than to carry out the functions as set forth herein, the United States and Monitor will hold such information in strict confidence as permitted by federal law. The Monitor and the United States will provide reasonable advance notice of any visit or inspection or request for access to any State facilities. If the Monitor or the United States has a reasonable belief that a child faces a risk of immediate and serious harm, they shall promptly notify the State. Access is not intended, and will not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with information disclosed to the Monitor or the United States under this paragraph.

110.    In completing his or her responsibilities, the Monitor may require written reports and data from the State concerning compliance.

### A.    Monitoring Plan

111.    Within 90 days of the Monitor's appointment, the Monitor will develop a draft monitoring plan and provide it to the Parties for comment.

112.    The State and the United States will have 14 days to offer comments on the monitoring plan.

113.    The Monitor will consider all comments and finalize the monitoring plan within 14 days of receiving the comments from the State and the United States.

114.    As necessary, the Monitor may amend and revise the monitoring plan throughout the period of this Consent Decree. The Monitor will offer the Parties an opportunity to comment on any proposed revisions before finalizing them.

### B.    Monitoring Reports

115.    Six months after the Baseline Data Report and then every six months thereafter, the Monitor will conduct a compliance review and issue a Monitoring

Report. The purpose of the compliance reviews is to determine compliance with the requirements of this Consent Decree and the Implementation Plan. Compliance reviews will be conducted in part through the Quality Service Review and will be informed by the Baseline Data Report and Quarterly Data Reports and additional data and information gathering by the Monitor.

116.    A draft Monitoring Report will be provided to the State and the United States for comment at least 30 days prior to its issuance. The State and the United States will provide comments, if any, to the Monitor within 14 days of receipt of the draft Report. The Monitor will consider the responses of the State and the United States and make appropriate changes, if any, before issuing the final Report.

117.    The Monitoring Reports will describe the steps taken by the State to implement the requirements of this Consent Decree and the Implementation Plan, and will evaluate the extent to which the State has complied with the substantive provisions of the Consent Decree. Each Monitoring Report:

> a.    Will evaluate the status of compliance for the relevant sections of the Consent Decree and the Implementation Plan, using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance;
>
> b.    Will describe the steps taken to assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings; and
>
> c.    May provide recommendations to support the State in achieving compliance with each provision.

118.    These Monitoring Reports will be filed with the Court and the State will post them on its website within 14 days of filing. No personally identifiable information will be included in the reports without consent.

119.   Nothing in this section prohibits the Monitor from issuing interim letters or reports to the United States, the State, or the Court via the Court's filing system in this case should he or she deem it necessary.

### C.   Monitor's Relationship with Others

120.   In completing his or her responsibilities, the Monitor may testify in enforcement proceedings regarding any matter relating to the implementation, enforcement, or dissolution of the Consent Decree, including, but not limited to, the Monitor's observations, findings, and recommendations in this matter.

121.   The Monitor, and any staff or consultants retained by the Monitor, will not be liable for any claim, lawsuit, or demand arising out of their activities under this Consent Decree (this paragraph does not apply to any proceeding for payment under contracts into which he or she has entered in connection with his or her work under the Consent Decree); be subject to formal discovery in any litigation involving the services or provisions reviewed in this Consent Decree, including deposition(s), request(s) for documents, and request(s) for admissions, interrogatories, or other disclosure; testify in any other litigation or proceeding with regard to any act or omission of the State or any of the State's agents, representatives, or employees related to this Consent Decree, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Consent Decree, nor serve as a non-testifying expert regarding any facts that he or she may have learned as a result of his or her performance under this Consent Decree.

122.   The State and the United States will not otherwise employ, retain, or be affiliated with the Monitor, or professionals retained by the Monitor while this Consent Decree is in effect, unless the other Party gives its written consent to waive this prohibition.

123.   If the Monitor resigns from his or her position as Monitor, the State or the United States cannot contract with the former Monitor on a matter encompassed

by this Consent Decree without the written consent of the other Party while this Consent Decree remains in effect.

## XIII.  ENFORCEMENT AND TERMINATION

124.    The Parties agree jointly to file this agreement with the United States District Court for the District of Rhode Island. The joint motion will request that the Court enter the Consent Decree as an order of the Court.

125.    The Court will retain jurisdiction over this matter for the purposes of enforcing this Consent Decree as an order of the Court.

126.     Enforcement in Court on behalf of the United States will be conducted by the Department of Justice.

127.    During the period that the Consent Decree is in force, the Parties will request semi-annual status conferences with the Court to update the Court on the State's compliance with this Consent Decree.

128.    The Parties intend to pursue a collaborative approach to resolve disputes that may arise in the implementation of this Consent Decree regarding an alleged failure to comply with this Consent Decree, or regarding the meaning or monitoring of a provision of this Consent Decree. In the event of any dispute over the language, requirements or construction of this Consent Decree, the Parties agree to meet and confer in an effort to achieve a mutually agreeable resolution. If the Parties reach a resolution that varies from the Consent Decree, the resolution will be reduced to writing, signed, and filed with the Court.

129.    If the United States determines that the State has not made material progress toward compliance with an obligation under the Consent Decree, including as set forth in the Implementation Plan, the United States will give the State written notice of its determination, and the Parties will engage in good-faith discussions to resolve any dispute arising from this determination.

130.    The State will have 30 days from the date of such notice to cure the failure (or such additional time as is reasonable due to the nature of the issue and agreed upon by the Parties) and provide the United States and Monitor with sufficient proof of its cure.

131.    At the end of the period to cure (Paragraph 130), in the event that the United States determines that the failure has not been cured or that adequate remedial measures have not been implemented, the United States may initiate enforcement proceedings against the State in Court for an alleged failure to fulfill its obligation under this Consent Decree.

132.    This Consent Decree will terminate in five years from the Effective Date, if the State has attained substantial compliance with all provisions and maintained that compliance for a period of one year.

133.    The State may seek earlier termination of any full substantive section (VI, VII, etc.) of this Consent Decree by filing with the Court a motion to terminate that section. The burden will be on the State to demonstrate that it has attained substantial compliance with the requirements of that section or sections, and maintained its compliance with the requirements of that section or sections, as set forth in the Consent Decree and Implementation Plan, for at least two consecutive monitoring periods.  For purposes of this Consent Decree, substantial compliance is achieved if any violations of the Consent Decree and Implementation Plan are minor and occasional and not systemic. Non-compliance with mere technicalities, or isolated or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance.

134.    The State shall not be deemed non-compliant where a child or their family makes an informed choice to decline or refuse to participate in any of the assessments, care coordination, or services envisioned by this Consent Decree. Informed choice must be based on full and accurate information, and requires

reasonable, documented efforts to identify and address any concerns or objections to the services envisioned by this Consent Decree raised by the child or their family.

135.    Should any provision of this Consent Decree be declared or determined by any court to be illegal, invalid, or unenforceable, the validity of the remaining parts, terms, or provisions will not be affected. The Parties will not, individually or in combination with another, seek to have any court declare or determine that any provision of this Consent Decree is invalid.

136.    This Consent Decree will constitute the entire integrated agreement of the Parties.

137.    Any modification of this Consent Decree will be executed in writing by the Parties. All modifications, except for changes to interim deadlines, will be filed with the Court and will not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it.

## XIV.  GENERAL PROVISIONS

138.    The Consent Decree is binding on all successors, assignees, employees, agents, contractors, and all others working for or on behalf of the State to implement the terms of this Consent Decree and the Implementation Plan.

139.    In consideration of the terms of this Consent Decree, as set forth herein, the United States will close its investigations of DJ No. 204-66-78 and OCR No. 22-446693 and agrees to refrain filing a new civil suit under Title II of the ADA and Section 504, or seek other judicial relief, based on the allegations in the Complaint or the May 13, 2024 findings, except as provided under a specific provision of this Consent Decree.

140.    This Consent Decree and Implementation Plan are enforceable only by the Parties. No person or entity is intended to be a third-party beneficiary of the provisions of this Consent Decree and Implementation Plan for purposes of any civil,

criminal, or administrative action. Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Consent Decree.

141.    Interpretation of this Consent Decree will be governed by the following rule of construction: "including" means including without limitation, unless otherwise specified.

142.    The United States and the State will each bear the cost of their own fees and expenses incurred in connection with this case.

143.    The Parties agree that, as of the Effective Date of this Consent Decree, litigation is not "reasonably foreseeable" concerning the matters described in this Consent Decree. To the extent that any Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this Consent Decree, the Party is no longer required to maintain such a litigation hold. Nothing in this paragraph relieves any Party of any other obligations imposed by this Consent Decree, including the document creation and retention requirements described herein.

144.    Failure by any Party to enforce this entire agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Consent Decree.

145.    The Parties will promptly notify each other of any court or administrative challenge to this Consent Decree or any portion thereof, and will defend against any challenge to the Consent Decree.

146.    The State shall take all reasonable steps to comply with the Consent Decree's terms, including seeking from the Rhode Island General Assembly the appropriations necessary for the State to comply with the Consent Decree and Implementation Plan. If the State asserts that a legislative appropriation, action, or

inaction presents a barrier to compliance with one or more provisions of this Consent Decree, the following will occur:

    a. The State will document in writing to the United States that legislative action presents a barrier to compliance with one or more provisions of this Consent Decree, naming the specific provisions. The State will propose a written plan to reach substantial compliance with the provision(s) through an extension of the Consent Decree, specifying the necessary extended time and steps.

    b. The United States may make a counterproposal or accept the State's written plan. If the Parties reach agreement, they will jointly move to modify the Consent Decree, according to the process set out in Paragraph 137.

    c. If the Parties cannot reach agreement on a revised plan for continued implementation of the Consent Decree, the United States may withdraw its consent to the Consent Decree, and both Parties may revive any claims or defenses otherwise barred by its operation. Nothing in this paragraph is intended to prohibit the United States from enforcing, consistent with this Consent Decree, those provisions of the Consent Decree that the Rhode Island General Assembly has adequately funded or enacted, but with which the State is nevertheless not in compliance.

147. The Parties represent and acknowledge this Consent Decree is the result of extensive, thorough, and good faith negotiations. The Parties further represent and acknowledge that the terms of this Consent Decree have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of the allegations in the Complaint (ECF No. X). Each Party to this Consent Decree represents and warrants that the person who has signed this Consent Decree on behalf of a Party is duly authorized to enter into

36

this Consent Decree and to bind that Party to the terms and conditions of this Consent Decree.

148.   This Consent Decree may be executed in counterparts, each of which will be deemed an original, and the counterparts will together constitute one and the same Consent Decree, notwithstanding that each Party is not a signatory to the original or the same counterpart.

SO ORDERED, this ____7th____ day of ____January____, 2024.

_____
UNITED STATES DISTRICT JUDGE

Respectfully submitted this <u>19th</u> day of <u>December</u>, 2024.


AGREED AND CONSENTED TO:

**FOR THE UNITED STATES OF AMERICA:**


ZACHARY A. CUNHA
United States Attorney
District of Rhode Island

<u>/s/ Amy R. Romero</u>
AMY R. ROMERO
Assistant United States Attorney
United States Attorney's Office
District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903
Phone: (401) 709-5010
Amy.Romero@usdoj.gov


**<u>Of Counsel</u>:**

United States Department of Health and Human Services
STEPHANIE O. AKPA
Deputy General Counsel
MELANIE FONTES RAINER
Director, Office for Civil Rights

**FOR THE STATE OF RHODE ISLAND:**

*/s/ Richard Charest*
RICHARD CHAREST, R.Ph., MBA
In his official capacity as Secretary of the Executive Office of Health and
Human Services

*/s/ Ashley Deckert*
ASHLEY DECKERT, MSW, MA
In her official capacity as Director, Department of Children, Youth &
Families

*/s/ Richard Leclerc*
RICHARD LECLERC, MSW
In his official capacity as Director, Department of Behavioral Healthcare,
Developmental Disabilities & Hospitals

By:
PETER F. NERONHA
Attorney General
State of Rhode Island

*/s/ James J. Arguin*
JAMES J. ARGUIN (No. 10972)

*/s/ Jeff Kidd*
JEFF KIDD (No. 10416)
Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903
Tel: 401.274.4400
jarguin@riag.ri.gov
jkidd@riag.ri.gov